CHARLES D. SIEGAL (CA SBN 068603)
(*Pro Hac Vice Pending*)
Charles.Siegal@mto.com
ROHIT K. SINGLA (CA SBN 213057)
(*Pro Hac Vice Pending*)
Rohit.Singla@mto.com
TREVOR D. DRYER (CA SBN 247826)
(*Pro Hac Vice Pending*)
Trevor.Dryer@mto.com
KRISTINA WILSON (CA SBN 247829)
(*Pro Hac Vice Pending)*
Kristina.Wilson@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, CA  94105
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

PETER L. ASHMAN (NV SBN 2285)
*(Local Counsel)*
pla@ashmanlaw.com
LAW OFFICES OF PETER L. ASHMAN
617 S 8th Street, Suite B
Las Vegas, NV 89101-7082
Telephone:     (702) 735-1112
Facsimile:     (702) 382-7775

NIRA GEEVARGIS (CA SBN 236973)
(*Pro Hac Vice Pending*)
ngeevargis@lccr.com
PHILIP K. HWANG (CA SBN 185070)
(*Pro Hac Vice Pending*)
phwang@lccr.com
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
131 Steuart Street, Suite 400
San Francisco, CA, 94105
Telephone:     (415) 543-9444
Facsimile:     (415) 543-0296

Attorneys for Plaintiff
MOHAMED MAJED CHEHADE REFAI

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MOHAMED MAJED CHEHADE REFAI,<br><br>                    Plaintiff,<br><br>          vs.<br><br>PETER LAZARO, in his individual capacity; CITY OF NORTH LAS VEGAS; CITY OF NORTH LAS VEGAS POLICE DEPARTMENT; MARK PARESI, in his individual capacity; DOES 1 through 25 inclusive, in their individual capacities; and DOES 26 through 60 inclusive, in their individual and official capacities,<br><br>                    Defendants. | CASE NO.<br><br>**COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND** |

The plaintiff, MOHAMED MAJED CHEHADE REFAI ("Mr. Chehade")[1], alleges:

## SUMMARY OF THE CASE

1. For four days and three nights in late December 2006, agents of U.S. and local Nevada law enforcement detained Mr. Chehade—after he arrived at McCarran International Airport in Las Vegas to visit his daughter. Mr. Chehade is a 63-year-old German citizen with extensive family ties to the United States and no history of any criminal activity. Not only are all three of his children and his wife United States citizens, but Mr. Chehade has owned a home in Massachusetts for 20 years and has spent almost every summer at that residence since then. He is also a successful businessman, and presently works as the export director of a German company that manufactures pipes used primarily for sewage and water systems.

2. The government agents locked him up in the City of North Las Vegas Detention Center ("NLVDC"), mistreated him, and forcibly returned him to Germany.

3. These government agents also forced Mr. Chehade to suffer the following indignities, in violation of U.S. and Nevada law:

   a. They held him for four days and three nights in the NLVDC alongside detainees charged with violent criminal offenses, even though he had not been and was never charged with any criminal offense, in violation of Department of Homeland Security ("DHS") policy;

   b. They subjected him to unnecessarily rough physical treatment *en route* to the NLVDC;

   c. While in the NLVDC, they forced him to submit to humiliating strip and visual body-cavity searches in the presence of officers and another inmate, without justification; and

   d. They refused to let him take his heart medication for approximately thirty-six (36) hours, even though he had recently had heart surgery and had, while incarcerated, showed symptoms of distress, including high blood pressure, nosebleeds, and heart arrhythmia.

4. The government's illegal actions have damaged Mr. Chehade's health, caused him severe emotional distress, and harmed his reputation and income as a businessman.

---

[1] The English spelling of Mr. Chehade's name is "Shehadeh." The French spelling, Chehade, is used in this complaint as it is the spelling used in his German passport.

5.  About six months later, an FBI Special Agent and a Massachusetts State Trooper working with the FBI's Joint Task Force in Boston contacted Mr. Chehade's wife, Joanne Mulligan, and admitted to her that the detention of her husband *had been a mistake*. They also promised to help her arrange to have a new visa issued for Mr. Chehade. The State Trooper repeated these claims in several subsequent phone calls with Mrs. Mulligan, at one point saying that her husband had been incorrectly put on a U.S. government watch list, and that his name had been removed after the incident in Las Vegas.

6.  This complaint seeks redress for Mr. Chehade's injuries caused by the government's unlawful detention and treatment.

## JURISDICTION AND PROCEDURAL PREREQUISITES TO SUIT

7.  This Court has jurisdiction over all counts asserted in this complaint pursuant to 28 U.S.C. §§ 1331, 1343(a)(4) & 1367.

8.  The Court's jurisdiction over Counts One, Two and Three (for violations of the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution, respectively), arises under 28 U.S.C. §§ 1331 & 1343(a)(4), because those counts allege violations of the U.S. Constitution and/or 42 U.S.C. § 1983.

9.  The Court's jurisdiction over Counts Four through Eight (for claims under state law), arises under 28 U.S.C. § 1367, because those counts are so related to the counts arising under federal law that they form part of the same case or controversy, and under 28 U.S.C. § 1332(a)(2), because matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is, on information and belief, between citizens of Nevada or other States and a citizen of a foreign state.

10. On March 18, 2008, Mr. Chehade filed an administrative claim with the U.S. Department of Homeland Security ("DHS"), pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 ("FTCA"). The DHS has yet to decide that claim. If the claim is denied in whole or in part, Mr. Chehade intends to amend this complaint to add all denied FTCA claims against the United States of America and its employees in their official capacities.

## VENUE

11. The District of Nevada is the proper venue for this action, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Mr. Chehade's claims occurred in this District.

## PARTIES

12. The plaintiff, MAJED CHEHADE, is a citizen and resident of Germany. He is well-educated and has extensive ties to the United States. He has been married to Joanne Mulligan, a United States citizen, since 1976. The couple has three children, all of whom are United States citizens and one of whom presently lives in California and is a member in good standing of the California state bar. Until this incident, Mr. Chehade had been visiting the United States almost every year since approximately 1978. He has owned a home in Massachusetts for 20 years, which he visited almost annually until 2006, when the incident that is the subject of this complaint occurred.

13. Defendant PETER LAZARO ("Lazaro") was a DHS Senior Special Agent of Investigation at all relevant times. Mr. Chehade is informed and believes that Lazaro resided in Nevada at all relevant times. Mr. Chehade is also informed and believes that Lazaro acted under color of federal law and, in whole or in part, in his capacity as a DHS employee.

14. Defendant CITY OF NORTH LAS VEGAS ("North Las Vegas") is a municipality in Nevada. Upon information and belief, it owned and operated the NLVDC, where Mr. Chehade was detained, at all relevant times. Mr. Chehade is informed and believes that at all relevant times North Las Vegas had a policy, custom, and/or usage by which non-criminal aliens refused admission at an air port-of-entry were booked into local jail facilities. Mr. Chehade is also informed and believes that at all relevant times North Las Vegas had a policy, custom, and/or usage by which non-criminal aliens detained at the NLVDC were subjected to strip and/or visual body-cavity searches. Mr. Chehade is also informed and believes that all relevant times North Las Vegas had a policy, custom, and/or usage by which NLVDC personnel deprived persons detained at the NLVDC of their prescription medication and of adequate medical care.

15. Defendant CITY OF NORTH LAS VEGAS POLICE DEPARTMENT ("NLVPD") is a department of North Las Vegas. According to the Police Department's website, http://www.cityofnorthlasvegas.com/Departments/Police/Detention.shtm, its Detention/Correction Division provides detention services at the NLVDC. Mr. Chehade is informed and believes that at all relevant times NLVPD had a policy, custom, and/or usage by which non-criminal aliens refused admission at an air port-of-entry were booked into local jail facilities. Mr. Chehade is also informed and believes that all relevant times NLVPD had a policy, custom, and/or usage by which non-criminal aliens detained at the NLVDC were subjected to strip and/or visual body-cavity searches. Mr. Chehade is also informed and believes that at all relevant times NLVPD had a policy, custom, and/or usage by which NLVDC personnel deprived persons detained at the NLVDC of their prescription medication and of adequate medical care.

16. Defendant MARK PARESI ("Paresi") was the Chief of Police of Defendant NLVPD at the time Mr. Chehade was incarcerated. Mr. Chehade is informed and believes that Paresi was a resident of North Las Vegas, Nevada, at all relevant times.

17. Mr. Chehade is presently unaware of the true identities of Defendants Does 1 through 60 inclusive, so he sues each such Defendant by a fictitious name. Mr. Chehade is informed and believes that Does 1 through 60 inclusive are legally responsible for the wrongs committed against him, as alleged herein. Mr. Chehade is informed and believes that Does 1 through 25 are likely, but not definitely, current or former employees of DHS; he sues Does 1 through 25 in their individual capacities. Mr. Chehade is informed and believes that Does 26 through 45 are likely, but not definitely, current or former employees of Defendant North Las Vegas; Plaintiff sues Does 26 through 45 in their individual and official capacities. Mr. Chehade is unaware of the identities or roles of Does 46 through 60 but is informed and believes that they were involved in and are responsible for part or all of the acts alleged herein. All references herein to the "DHS officials" are references to Lazaro and Does 1 through 25 or a subset thereof.

18. Mr. Chehade also is informed and believes that Does 1 through 45, and possibly Does 46 through 60, were acting under color of state and/or federal law in their capacities as employees of the DHS, North Las Vegas, and/or NLVPD.

19. When Mr. Chehade becomes aware of the true identities of the Doe Defendants, he will amend his complaint to add them as named Defendants.

### FACTS

**A.     DHS Employees Detain Mr. Chehade at McCarran International Airport**

20. On Thursday, December 28, 2006, Mr. Chehade arrived at Las Vegas McCarran International Airport ("LAS") at 2:05 p.m. on Condor flight DE 4082 from Frankfurt International Airport ("FRA"). He had come to visit his daughter, a United States citizen who lives in Bakersfield, California.

21. At the immigration counter, Mr. Chehade encountered the desk officer, Customs and Border Patrol Officer William Jones III ("Officer Jones"). After Officer Jones spoke with Mr. Chehade and checked some information on his computer terminal, he escorted Mr. Chehade to a room in the airport. Once inside, he announced that Mr. Chehade would be denied entry into the United States. No explanation was provided for why he was being denied entry. Mr. Chehade had previously entered the United States on numerous occasions without incident, most recently in July 2006. Officer Jones asked Mr. Chehade a series of questions regarding his nationality, ancestry, and other personal information, and recorded the answers on a Department of Justice "Record of Sworn Statement in Administrative Proceedings," and forced Mr. Chehade to sign it.

22. Once the statement was signed, Officer Jones presented Mr. Chehade with two options: (1) sign a voluntary return form and return to Germany on the aircraft that had taken him to Las Vegas, which was leaving at 4:55 that afternoon, or (2) remain in detention while agents further investigated his case. The officer also commented that choosing the second option would make the situation more "complicated." Mr. Chehade opted to return to Germany on the 4:55 p.m. flight but commented that he did not believe that he had agreed to do so "voluntarily."

**B.     Interrogation by DHS Senior Special Agent of Investigation Lazaro Causes Mr. Chehade to Miss His Flight Home**

23.     After signing the form, DHS officers took Mr. Chehade's fingerprints, palm prints, and photograph. Lazaro, a senior DHS officer, then arrived to interrogate Mr. Chehade. He asked Mr. Chehade a series of questions, some of which bordered on the bizarre, such as whether Mr. Chehade knew who had killed former Lebanese Prime Minister Rafiq Al Hariri. Mr. Chehade answered all of Lazaro's questions fully and truthfully. Lazaro and other Defendants did not permit Mr. Chehade to catch his 4:55 p.m. flight.

**C.     DHS Officials Detain Mr. Chehade for Four Days and Three Nights in a Local Jail, in Violation of DHS Policy and Ask Mr. Chehade to Spy for Them**

24.     DHS officials forced Mr. Chehade to spend the next four days and three nights in the NLVDC, a local jail facility. This decision was in violation of DHS policy as stated in an Immigration and Naturalization Service memorandum, which provides that non-criminal aliens like Mr. Chehade "should NOT be booked into any jail facility absent extraordinary circumstances."

25.     When transferring Mr. Chehade to the NLVDC, the DHS agents handcuffed the 63-year-old man behind his back and placed him in the back seat in a car without buckling his seatbelt, causing him to strike his head against the car's front seat at every stop on the ride to the jail. The positioning of the handcuffs behind his back also caused Mr. Chehade considerable shoulder pain, but the agents refused his requests to be handcuffed from the front.

26.     DHS officials also detained Mr. Chehade at the NLVDC in conditions under which they knew, or reasonably should have known, that Mr. Chehade would be mistreated. For example, once at the NLVDC, jail officials placed Mr. Chehade in a cell for the night with about twenty-five other inmates, including those charged with violent criminal offenses such as burglary and assault. The cell, which measured approximately forty square meters, had no heat, bed, or blankets, and was cold from the winter air in the Nevada desert. Mr. Chehade thus passed the night on a cold cell floor, without a jacket. The cell had only one toilet for all twenty-five

inmates, located in the open. Fearing the humiliation of using the toilet in front of the other inmates, Mr. Chehade did not eat until he was transferred to another cell the following day.

27. Mr. Chehade spent the following four days at the NLVDC, save when he was taken back to the airport for a few hours on December 29, ostensibly for further questioning. No one, however, came to question him while he was there. Rather, he waited in a room for four or five hours. At one point, a female officer poked her head into the room and shouted something to the effect of, "You, Syrian, come here!", but he had no other meaningful contact with DHS officers at the airport. Afterwards, officers returned him to the NLVDC, whereupon he was placed into a four-man cell.

28. Officers brought Mr. Chehade out of his cell for questioning one other time on December 30. They took him to a room in the NLVDC where Lazaro awaited, along with a woman who refused to identify herself. The pair asked many of the same questions Lazaro had posed at the airport on December 28. They stated that they were the "only ones who could help [Mr. Chehade]," but he first needed to cooperate with them. They demanded that he cooperate with U.S. authorities after returning to Germany by providing them with information on people with anti-American sentiments and helping them with other matters from time to time. They suggested that if he did not cooperate, he would never be able to return to the United States where his daughter and grandchild live. They informed him that he should tell no one about their conversation. At the end of the interview, Lazaro provided Mr. Chehade with his contact information, along with an instruction for Mr. Chehade to send him an email once he arrived back in Germany. These comments alarmed Mr. Chehade, who understood them to be demanding that he work as a spy for the United States if he wanted to return to see his daughter and grandchild.

29. The following day, December 31, DHS and NLVDC officials released Mr. Chehade from custody and allowed him to fly back to Germany. They returned him to the airport without first allowing him to change clothes or shave, and forced him to appear in public handcuffed and unkempt. Once at the terminal, officials let him change his clothes before boarding the plane for Germany, Condor flight DE 7083.

30. Shortly after Mr. Chehade was forced to leave the country, a spokesperson for U.S.

Customs and Border Protection, Roxanne Hercules, told the press that Mr. Chehade was detained and excluded from the country because "he could have a criminal record, or it could be a terrorism issue." No criminal charges concerning this incident, however, were ever filed against Mr. Chehade. Nor has Mr. Chehade ever had any connection to any kind of terrorism. The government's statements were false and defamatory.

31.     In the summer of 2007, FBI Special Agent John P. Crane and Massachusetts State Trooper Thomas K. Sarrouf, both of whom worked with the FBI's Joint Task Force in Boston, approached Mr. Chehade's wife at Logan International Airport while she was visiting the United States, and informed her that the detention and exclusion of her husband from the U.S. had been a mistake. They also offered to assist her in obtaining another U.S. visa for her husband, and gave her their business cards. Then, in early 2008, Trooper Sarrouf told Ms. Mulligan over the telephone that Mr. Chehade had been incorrectly placed on a watch list, but that his name had been removed from that list after Mr. Chehade's detention.

### D.     Mr. Chehade was Denied Vital Medication for Over Thirty-Six Hours

32.     DHS and NLVDC officials also prevented Mr. Chehade from taking his medication, including medication for his heart condition, for roughly thirty-six hours while in their care, even though DHS officials and, upon information and belief, NLVDC employees knew that the medication was vital. Prior to transporting Mr. Chehade to the NLVDC on December 28, Lazaro was informed that Mr. Chehade had suffered a massive heart attack two years prior, underwent multiple bypass surgeries which hospitalized him for weeks, and took medication to prevent future heart problems. Nevertheless, NLVDC officials took Mr. Chehade's heart medication when he arrived at the jail in the evening of December 28, along with his other possessions. Although Mr. Chehade asked to keep the medication with him, the officers refused, stating that his medication was not allowed inside the facility and that they would dispense their own medicine for him.

33.     Jail officials did not, however, give Mr. Chehade any medication until around 9:30 a.m. on December 30, more than thirty-six hours after Mr. Chehade had first arrived at the

NLVDC. In the interim, they ignored symptoms that Mr. Chehade's medical condition was deteriorating without the medicine. During the morning of December 29, he asked his guards several times for his pills, but they either ignored him or, in one instance, screamed at him to "shut up." Around lunchtime that day, medics took Mr. Chehade's blood pressure, which returned a dangerously high systolic pressure of over 180 mmHg. When the medics expressed concern at this, Mr. Chehade explained his heart condition and showed them the scars from his open-heart surgery. Nevertheless, neither the medics nor the guards dispensed any medication. In addition, later that day Mr. Chehade began experiencing nosebleeds and an arrhythmic heartbeat. Still, he did not receive any medication until the following morning.

34. NLVDC officials also refused Mr. Chehade access to a doctor while they were withholding his medication. Upon information and belief, a doctor was on call at the NLVDC on December 29, but Mr. Chehade was never informed of his or her presence, nor was permitted to see him or her.

**E.   Mr. Chehade Was Subjected to Illegal Strip and Visual Body-Cavity Searches**

35. DHS officials housed Mr. Chehade at the NLVDC, where they knew, or reasonably should have known, that he would be subjected to unlawful strip and visual body-cavity searches. In particular, on the afternoon December 29, Mr. Chehade was subjected to two such searches by NLVDC officials. The searches occurred only after Mr. Chehade had returned to the NLVDC from McCarran International Airport, been re-booked into the facility, and been placed in a four-man cell with at least one other inmate. Some time thereafter, officers took him and another inmate to another room and told them to strip. Once the two were naked, officers instructed them to kneel down and cough, while the officers visually examined their anuses and genitals from the backside. The officers then asked Mr. Chehade to repeat this procedure, purportedly because he did not expose himself to the officers' satisfaction the first time.

**F.  Defendants' Conduct has Caused Mr. Chehade Financial,
Reputational, and Emotional Injury**

36.  During and after his detention, Mr. Chehade suffered severe anxiety, anger, and depression due to the conditions of his incarceration, the strip and visual body-cavity searches, the repeated interrogations, and the denial of his heart medication.  Mr. Chehade also suffered severe emotional distress from his understanding that U.S. officials were attempting to coerce him into acting as a spy for the U.S. government.  Moreover, the denial of his medication caused him to have high blood pressure, nosebleeds, and an arrhythmic heartbeat, and may have placed him at greater risk for another heart attack or other cardiovascular problems in the future.  He also experienced pain, discomfort, and anxiety from being handcuffed behind his back and roughly treated while in transit to the NLVDC on December 28, 2006, and while being forced to share a cell with inmates accused of violent felonies.

37.  Mr. Chehade is informed and believes that each Defendant aided and abetted the actions of each of the other Defendants in engaging in the above-described conduct.

38.  Mr. Chehade is informed and believes that the above-described acts of Defendants were done knowingly, intentionally, maliciously, with deliberate and callous indifference to Mr. Chehade's personal safety, security, freedom, and civil and constitutional rights, and/or with intent to injure, harass, and oppress him.  Accordingly, Mr. Chehade is entitled to an award of punitive damages against all Defendants.

**COUNT ONE**

**(Violation of Fourth Amendment)**

**Against Defendants Lazaro, Does 1-25, and Does 46-60**

39.  Mr. Chehade refers to and incorporates all the foregoing paragraphs as though fully set forth herein.

40.  By committing the above-described acts and setting in motion a series of acts by others, Defendants Lazaro, Does 1-25 and Does 46-60 violated the Fourth Amendment to the U.S. Constitution because, upon information and belief, it was reasonably foreseeable that their

1  actions would lead to the violation of Mr. Chehade's Fourth Amendment rights. Also, upon
2  information and belief, these Defendants, acting individually or in concert with any or all of the
3  other Defendants, set into motion a series of acts by others which they knew or reasonably should
4  have known would cause others to violate Mr. Chehade's Fourth Amendment rights.

41.  At all times, these actions were unprivileged and violated clearly established law.

## COUNT TWO

**(Violation of Fifth Amendment)**

**Against Defendants Lazaro, Does 1-25, and Does 46-60**

42.  Mr. Chehade refers to and incorporates all the foregoing paragraphs as though fully set forth herein.

43.  By committing the above-described acts and setting in motion a series of acts by others, Defendants Lazaro, Does 1-25, and Does 46-60 violated the Fifth Amendment to the U.S. Constitution because, upon information and belief, it was reasonably foreseeable that their actions would lead to the violation of Mr. Chehade's Fifth Amendment rights. Also, upon information and belief, these Defendants, acting individually or in concert with any or all of the other Defendants, set into motion a series of acts by others which they knew or reasonably should have known would cause others to violate Mr. Chehade's Fifth Amendment rights.

44.  At all times, these actions were unprivileged and violated clearly established law.

## COUNT THREE

**(Violation of Fourteenth Amendment; 42 U.S.C. § 1983)**

**Against Defendants North Las Vegas, NLVPD, Paresi, and Does 26-60**

45.  Mr. Chehade refers to and incorporates all the foregoing paragraphs as though fully set forth herein.

46.  By committing the above-described acts and setting in motion a series of acts by others, Defendants Does 26-60 violated Mr. Chehade's rights under the Fourteenth Amendment

1  and are liable to him pursuant to 42 U.S.C. § 1983.  At all times, these actions were unprivileged
2  and violated clearly established law.

3     47.   Defendant Paresi violated the Fourteenth Amendment to the U.S. Constitution and is
4  liable to him pursuant to 42 U.S.C. § 1983 because, upon information and belief, it was
5  reasonably foreseeable that his actions would lead to the violation of Mr. Chehade's Fourteenth
6  Amendment rights.  Also, upon information and belief, Defendant Paresi, acting individually or in
7  concert with any or all of the other Defendants, set into motion a series of acts by others which he
8  knew or reasonably should have known would cause others to violate Mr. Chehade's Fourteenth
9  Amendment rights.  At all times, these actions were unprivileged and violated clearly established
10 law.

11    48.   Upon information and belief, Defendants North Las Vegas and NVLPD, through their
12 policy, custom, and/or usage, induced and/or assisted Does 26-60 in performing the actions
13 described in the above paragraphs, thereby aiding and abetting that conduct.  At all times, these
14 actions were unprivileged and violated clearly established law.

15

16 **COUNT FOUR**

17 **(Intentional Infliction of Emotional Distress)**

18 **Against All Defendants Except Lazaro and Does 1-25**

19    49.   Mr. Chehade refers to and incorporates all the foregoing paragraphs as though fully set
20 forth herein.

21    50.   By committing the acts and/or omissions described above—including but not limited
22 to detaining him in the NLVDC, placing him in cells with inmates accused of violent criminal
23 offenses, subjecting him to strip and visual body-cavity searches, taking his heart medication and
24 refusing to return it or provide replacement medication for over thirty-six hours—Defendants
25 Does 26-60 engaged in extreme and outrageous conduct.  Moreover, Defendants North Las
26 Vegas, NLVPD, and Paresi are vicariously liable for the tortious acts of their employees that
27 occurred within the course and scope of employment.

28    51.   These Defendants engaged in the above acts and/or omissions with either the intention

of, or reckless disregard for, causing Mr. Chehade physical injury and severe or extreme emotional distress.

52. These Defendants' acts and/or omissions actually and proximately caused Mr. Chehade to suffer severe or extreme emotional distress.

## COUNT FIVE

**(Negligent Infliction of Emotional Distress)**

**Against All Defendants Except Lazaro and Does 1-25**

53. Mr. Chehade refers to and incorporates all the foregoing paragraphs as though fully set forth herein.

54. By committing the acts and/or omissions described above—including but not limited to detaining him in the NLVDC, placing him in cells with inmates accused of violent criminal offenses, subjecting him to strip and visual body-cavity searches, taking his heart medication and refusing to return it or provide replacement medication for over thirty-six hours—Defendants Does 26-60 engaged in extreme and outrageous conduct. Moreover, Defendants North Las Vegas, NLVPD, and Paresi are vicariously liable for the tortious acts of their employees that occurred within the course and scope of employment.

55. These Defendants engaged in the above acts and/or omissions negligently, causing Mr. Chehade physical injury and severe or extreme emotional distress.

56. These Defendants' acts and/or omissions actually and proximately caused Mr. Chehade to suffer severe or extreme emotional distress.

## COUNT SIX

**(Assault)**

**Against All Defendants Except Lazaro and Does 1-25**

57. Mr. Chehade refers to and incorporates all the foregoing paragraphs as though fully set forth herein.

58. Through the acts described above, Defendants Does 26-60 intended to cause harmful

or offensive physical contact to Mr. Chehade, including but not limited to subjecting him to strip and visual body-cavity searches. In so doing, these Defendants put Mr. Chehade in apprehension of such contact. Moreover, Defendants North Las Vegas, NLVPD, and Paresi are vicariously liable for the tortious acts of their employees that occurred within the course and scope of employment.

### COUNT SEVEN

#### (Battery)

**Against All Defendants Except Lazaro and Does 1-25**

59. Mr. Chehade refers to and incorporates all the foregoing paragraphs as though fully set forth herein.

60. Through the acts described above, Defendants Does 26-60 intended to cause harmful or offensive contact to Mr. Chehade, including but not limited to subjecting him to strip and visual body-cavity searches. Such harmful or offensive contact did in fact occur to Mr. Chehade. Moreover, Defendants North Las Vegas, NLVPD, and Paresi are vicariously liable for the tortious acts of their employees that occurred within the course and scope of employment.

### COUNT EIGHT

#### (Negligence)

**Against All Defendants Except Lazaro and Does 1-25**

61. Mr. Chehade refers to and incorporates all the foregoing paragraphs as though fully set forth herein.

62. Defendants North Las Vegas, NLVPD, Paresi, and Does 26-60 owed Mr. Chehade a duty of care not to cause him to be subject to unreasonable strip searches and visual body-cavity searches at the NLVDC. By committing the above-described acts without having taken reasonable precautions to avoid such unreasonable searches, these Defendants breached their duty of care and actually and proximately caused harm to Mr. Chehade, as described above. Such harm includes, but is not limited to, severe emotional distress that these Defendants reasonably

and should have known would result from this conduct.

63. Defendants North Las Vegas, NLVPD, Paresi, and Does 26-60 owed Mr. Chehade a duty of care not to cause him to be denied his heart medication and necessary medical treatment for over thirty-six hours while imprisoned at the NLVDC. By committing the above-described acts without having taken reasonable precautions to avoid the denial of his heart medication and necessary medical treatment, these Defendants breached their duty of care and actually and proximately caused harm to Mr. Chehade, as described above. Such harm includes, but is not limited to, severe emotional distress that these Defendants reasonably and should have known would result from this conduct.

64. Defendants North Las Vegas, NLVPD, Paresi, and Does 26-60 owed Mr. Chehade a duty of care not to cause him to be detained in the NLVDC alongside detainees charged with violent criminal offenses, when Mr. Chehade had not been and was never charged with any criminal offense. By committing the above-described acts without having taken reasonable precautions to avoid detaining him in such conditions, these Defendants breached their duty of care and actually and proximately caused harm to Mr. Chehade, as described above. Such harm includes, but is not limited to, severe emotional distress that these Defendants reasonably and should have known would result from this conduct.

## PRAYER FOR RELIEF

Mr. Chehade prays for the following relief:

65. That judgment be entered in favor of Mr. Chehade on all counts and against each Defendant;

66. That Mr. Chehade be awarded actual damages against all Defendants in the amount of at least one million U.S. dollars ($1,000,000);

67. That Mr. Chehade be awarded nominal damages, if appropriate;

68. That Mr. Chehade be awarded punitive damages against all Defendants;

69. That Mr. Chehade be awarded attorneys' fees and costs of suit, pursuant to 42 U.S.C. § 1988 and any other applicable statutory, common-law, or constitutional provisions;

70. That the Court award such other relief as it may deem just and proper.

### **DEMAND FOR JURY TRIAL**

71. Mr. Chehade demands a jury trial with respect to each of his claims.

DATED: August 20, 2008    MUNGER, TOLLES & OLSON LLP


By: _____/s/_____
          TREVOR D. DRYER

Attorneys for Plaintiff
MOHAMED MAJED CHEHADE REFAI

DATED: August 20, 2008    LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA


By: _____/s/_____
          NIRA GEEVARGIS

Attorneys for Plaintiff
MOHAMED MAJED CHEHADE REFAI

DATED: August 20, 2008    LAW OFFICES OF PETER L. ASHMAN


By: _____/s/_____
          PETER L. ASHMAN

Local Counsel for Plaintiff
MOHAMED MAJED CHEHADE REFAI